## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ATG FUND II LLC, individually and on behalf of all others similarly situated,<br><br>                    Plaintiff,<br><br>          v.<br><br>VPC IMPACT ACQUISITION HOLDINGS SPONSOR II, LLC, BRENDAN CARROLL, GORDON WATSON, CARLY ALTIERI, JOHN MARTIN, JOSEPH LIEBERMAN, and KAI SCHMITZ,<br><br>                    Defendants,<br><br>-and-<br><br>VPC IMPACT ACQUISITION HOLDINGS II,<br><br>                    Nominal Defendant. | Civil Action No. 23-1978<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff ATG Fund II LLC ("Plaintiff") alleges for its class action complaint against VPC Impact Acquisition Holdings II ("VPCB" or the "SPAC"), VPC Impact Acquisition Holdings Sponsor II, LLC (the "Sponsor"), Brendan Carroll, Gordon Watson, Carly Altieri, John Martin, Joseph Lieberman, and Kai Schmitz (together, the "Defendants") the following upon knowledge as to itself and its own actions, and upon information and belief as to all other matters.

## I.       INTRODUCTION

1.       This case involves the self-interested misappropriation of a $50 million corporate asset belonging to a special purpose acquisition company (or SPAC) and its public stockholders orchestrated by the SPAC's sponsor, officers and directors.

2.       The SPAC, VPCB, was formed by Victory Park Capital Advisors, LLC ("Victory Park") to complete a business combination with private company. It is operated by its Sponsor, an

entity created, owned and controlled by Victory Park. The SPAC's officers and directors are, with only two exceptions, senior executives of Victory Park.

3.     Like a typical SPAC, VPCB was structured to be a boom or bust proposition for its Sponsor: Defendants would either (i) own twenty percent of the public portion of the post-acquisition company if the SPAC successfully completed a business combination; or (ii) lose their entire investment if it failed to complete a business combination.

4.     Prior to raising money from the public, VPCB issued millions of shares of Class B common stock ("Founder Shares") at less than a penny per share to the Sponsor (*i.e.*, Victory Park) as well as the only two SPAC directors not directly affiliated with Victory Park. As a result, each of the SPAC's officers and directors have substantial financial interests in the Founder Shares through their employment with Victory Park or direct ownership of shares.

5.     In March 2021, the SPAC completed an initial public offering ("IPO") of Class A common stock (the "Public Shares") at $10.00 per share, generating proceeds of approximately $254 million. The proceeds of the IPO were placed in a trust account pending the SPAC's business combination or liquidation.

6.     The SPAC had two years to use the IPO proceeds to complete a business combination. If the SPAC successfully completed a transaction, then Defendants' Founder Shares would convert to Public Shares worth over $60 million on paper. If, however, the SPAC failed to close a deal, then the SPAC's assets would be returned to investors, the Founder Shares would become worthless, and Defendants would lose their capital invested.

7.     That economic bargain—*i.e.*, the Sponsor's risk of a complete loss of its private investment in exchange for the prospect of an exponential return if the SPAC were to strike a deal—forms the heart of the SPAC model. Public stockholders relied on this incentive structure to

motivate the Sponsor to identify and close an attractive acquisition on the SPAC's behalf, and thus mitigate the risk that stockholders' capital would be tied up for two years without meaningful returns.

8.      Defendants repeatedly acknowledged in public filings that they would lose their entire investment if the SPAC did not complete a business combination, and each Defendant contractually agreed in connection with the IPO that they would have "no right, title, interest or claim of any kind in or to *any monies held in the [t]rust [a]ccount or any other asset* of the [SPAC] as a result of any liquidation." (Emphasis added.)

9.      In August 2021, Defendants announced a proposed transaction with Kredivo (defined below), a consumer credit platform operating in Southeast Asia. The transaction valued Kredivo at $2.5 billion and Defendants touted the company as the "largest and fastest growing" consumer finance business in the region.

10.      The deal was supposed to close no later than the first quarter of 2022, but by early 2022 the SPAC had yet to seek shareholder approval of the transaction, and Kredivo was seeking an out. Rather than enforce the SPAC's right to force Kredivo to close, Defendants struck a new deal to make their multimillion-dollar windfall anyway, despite that the SPAC's deal would fall apart.

11.      In March 2022, Defendants announced that they had agreed to a mutual termination of the Kredivo transaction through which the SPAC waived its rights to enforce the transaction agreement and released claims for breach. Defendants obtained three forms of consideration in exchange for the SPAC's agreement: (i) Victory Park orchestrated for itself and other institutional investors a $145 million private investment in Kredivo; (ii) Kredivo agreed to pay to the SPAC $4 million as a reimbursement of transaction costs; and (iii) Kredivo agreed that, if the SPAC failed

to identify a replacement transaction, it would issue warrants permitting the SPAC to acquire up to 3.5% of Kredivo's outstanding equity.

12.     At the original transaction valuation, the equity stake in Kredivo was worth in excess of $87 million and, even at a more recent, lower valuation of the company, the warrants are still worth $50.4 million. At the time of the termination, Defendants remained silent as to how the value of the warrants would be distributed.

13.     Having secured the equity stake from Kredivo, contingent on the SPAC failing to identify a new deal, Defendants had no incentive to identify a replacement deal and ultimately chose not do so. A year later, in March 2023, six days before the SPAC's deadline to complete a transaction, Defendants announced that the SPAC would dissolve, triggering the SPAC's entitlement to the Kredivo warrants.

14.     Instead of distributing the value of the warrants to public stockholders, Defendants announced that the Public Shares would be redeemed immediately in exchange for only the IPO proceeds (*i.e.*, shareholders would get their money back with nominal interest), and the "redemption will completely extinguish public shareholders' rights as shareholders (*including the right to receive further liquidation distributions, if any*)." (Emphasis added.)

15.     Thereafter, only the Sponsor and other Defendants, as the remaining stockholders in the SPAC through their ownership of Founder Shares, would stand to reap the value of the Kredivo warrants. Defendants hired a third-party liquidator to determine how to liquidate and distribute the SPAC's remaining assets, including the Kredivo warrants, to themselves.

16.     If allowed to proceed, Defendants will achieve precisely what the SPAC structure does not allow: an exponential profit on their initial investment, procured through their control of the SPAC and its public assets, despite having failed to complete a transaction.

17.     Defendants' efforts are self-interested, disloyal and a breach of the SPAC's governing documents, given that the break-up fee is a corporate asset to which Defendants have "no right, title, interest or claim." Judicial intervention is required to prevent this misappropriation.

## II.     THE PARTIES

18.     Plaintiff ATG Fund II LLC is a Delaware limited liability company and the owner of Class A Public Shares of VPCB.

19.     Nominal Defendant VPCB is a special purpose acquisition company, sometimes called a "blank check company," organized as a Cayman Islands exempted company. It was formed for the purpose of completing a business combination by Victory Park, an international asset manager.

20.     Defendant Sponsor is a Delaware limited liability company and controls and manages the SPAC. Victory Park controls the Sponsor through an affiliate, Victory Park Management, LLC, which serves as the Sponsor's Manager.

21.     Defendant Carroll is the SPAC's Co-Chief Executive Officer and a member of the Board. He is a Senior Partner at Victory Park, which he co-founded in 2007, and is responsible for strategic initiatives and firm operations in addition to sourcing, evaluating and executing investment opportunities.

22.     Defendant Watson is the SPAC's Co-Chief Executive Officer. He is a Partner at Victory Park and is a member of Victory Park's investment committee.

23.     Defendant Altieri is the SPAC's Chief Financial Officer. She is a Fund Controller at Victory Park and oversees Victory Park's fund accounting team in the execution of accounting, finance, tax, audit, reporting and treasury related activities.

24.     Defendant Martin is the Chairman of the Board. He is a Senior Partner at VPC.

25.    Defendant Lieberman is a member of the Board. Following his service in the U.S. Senate, he is now Senior Counsel at Kasowitz, Benson & Torres LLP. He has a preexisting relationship with Defendant Carroll dating to when Carroll worked in multiple capacities for Lieberman during his time in the U.S. Senate.

26.    Defendant Schmitz is a member of the Board. He is a Partner at Amadeus Capital.

### III.    JURISDICTION AND VENUE

27.    This Court has jurisdiction over this action under 28 U.S. Code § 1332(a) and (d).

28.    Venue is proper in this judicial district under 28 U.S.C. §1391(b)(1) and (2).

29.    This Court has jurisdiction over Defendants because they transact a substantial amount of business in New York, have substantial ties to New York, and/or are citizens or residents of New York or otherwise maintain sufficient minimum contacts with New York to render jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

30.    This Court also has jurisdiction over Defendants because the Sponsor Agreement (defined below), to which each Defendant is a party, states that it "shall be governed by and construed and enforced in accordance with the laws of the State of New York," and that the "parties hereto (i) all agree that any action, proceeding, claim or dispute arising out of, or relating in any way to, this [Sponsor] Agreement shall be brought and enforced in the courts of New York City, in the State of New York, and irrevocably submit to such jurisdiction and venue, which jurisdiction and venue shall be exclusive and (ii) waive any objection to such exclusive jurisdiction and venue or that such courts represent an inconvenient forum."

# IV.    SUBSTANTIVE ALLEGATIONS

A.    **Victory Park Forms The Sponsor And
The SPAC To Complete A Business Combination**

31.    Victory Park is a registered investment advisor that advises sovereign wealth funds, insurance companies, financial institutions and foundations. It formed the SPAC and the Sponsor in 2021 for the purpose of "effecting a merger, share exchange, asset acquisition, share purchase, reorganization or similar business combination with one or more businesses."

32.    In connection with the formation of the SPAC and Sponsor, Victory Park committed to purchase $7,075,000 of private placement warrants in order to provide the SPAC with working capital.

33.    The SPAC's capital structure consists of two classes of common stock: Class A Public Shares issued to the public through an IPO and Class B Founder Shares issued to Defendants for a nominal amount.

34.    On January 14, 2021, the Sponsor purchased 7,187,500 Founder Shares for $25,000 (*i.e.*, approximately $0.004 per share). Thereafter, in January 2021, the Sponsor transferred 20,000 Founder Shares to each of Mr. Lieberman and Mr. Schmitz for no consideration (*i.e.*, 40,000 Founder Shares in total).

35.    The SPAC was designed so that Victory Park and the Defendants would profit through their Founder Shares only if the SPAC successfully completed a business combination. In the event of a business combination, the Class B Founder Shares were convertible to Class A Public Shares, and thus would be worth significantly more than the nominal price paid by the Sponsor. Otherwise, in the absence of a deal, the Founder Shares would become worthless and Victory Park would also lose its initial private placement investment.

36.     On March 4, 2021, the SPAC completed its IPO. The SPAC sold 25,376,598 units of Class A Public Shares at a price of $10.00 per share, generating proceeds of approximately $254 million. The proceeds of the IPO were placed in a trust account pending the SPAC's business combination or liquidation.

37.     In connection with the IPO, the Sponsor forfeited a certain amount of its Founder Shares so that, if the SPAC completed a business combination, the Defendants would own 20% of public holdings in the post-combination company.

38.     After the underwriter's exercise of the over-allotment option, and the Sponsor's forfeiture of shares, there were 6,394,617 Founder Shares outstanding as of the SPAC's most recent Form 10-Q. In connection with a business combination, the Founder Shares were convertible to Public Shares, and thus, at $10 per share, Defendants' ownership interest would be valued at over $63 million.

39.     In connection with the IPO, Defendants confirmed that they would not profit from their investment in the SPAC unless they successfully completed a business combination for stockholders. Each Defendant agreed to a letter agreement with the SPAC (the "Sponsor Agreement") pursuant to which they waived any and all entitlement to the assets of the SPAC in connection with a liquidation, which would occur if the Defendants failed to complete a business combination.

40.     The Sponsor Agreement stated that, as to each Defendant, "it, he or she has no right, title, interest or claim of any kind in or to any monies held in the [SPAC's] [t]rust [a]ccount or any other asset of the [SPAC] as a result of any liquidation of the [SPAC] with respect to the Founder Shares held by it, him or her."

41.     The IPO prospectus also made clear that the "founder shares will be worthless if we do not complete an initial business combination" and, likewise, the "private placement warrants will also be worthless if we do not complete our initial business combination." Defendants repeatedly reaffirmed the same in the SPAC's periodic filings thereafter.

42.     Following the IPO, the SPAC had two years—or until March 9, 2023—to complete a business combination.

**B.     The SPAC Signs A Transaction Agreement With Kredivo,
          But Victory Park Flips The Transaction For A New Private Deal**

43.     On August 2, 2021, the SPAC announced that it had reached an agreement for a business combination with FinAccel Pte. Ltd. (d.b.a. Kredivo) ("Kredivo"), an AI-enabled digital consumer credit platform in Southeast Asia (the "Transaction").

44.     Victory Park and Kredivo had a long-standing relationship, and Victory Park had previously provided a $100 million credit facility to the company in July 2020, which it increased to $200 million in June 2021.

45.     The Transaction contemplated a pro forma value for the post-closing company of approximately $2.5 billion, of which public stockholders would acquire a significant percentage.

46.     After the announcement, the SPAC touted to investors Kredivo's prospects, including that it has "nearly 4 million approved customers today and a presence across eight of the top 10 e-commerce merchants in Indonesia," making it the "largest and fastest growing buy now, pay later (BNPL) platform in Indonesia today, with plans to expand into regional markets such as Vietnam and Thailand in the near future."

47.     The Transaction was supported by private investment in public equity ("PIPE") investments of $120 million from a range of institutional investors, including Victory Park, and was expected to close no later than the first quarter of 2022.

48.     By early 2022, however, the SPAC had not solicited shareholder approval of the Transaction. It appears that Kredivo's appetite for entering the U.S. markets was dwindling and it was regretting the deal.

49.     On March 14, 2022, Defendants revealed that the SPAC had agreed with Kredivo to "the mutual termination of their previously announced business combination agreement" (the "Termination"). It appears that Defendants let Kredivo off the hook in exchange for at least three forms of consideration, which exclusively benefit Victory Park at the expense of investors.

50.     First, "[c]oncurrent with the agreement to terminate," Victory Park orchestrated a "$145 million private structured investment in Kredivo" for itself and certain other institutional investors (the "Private Investment"). A structured investment usually combines a debt security with exposure linked to the performance of an underlying asset, such as equities, interest rates, commodities or currencies.

51.     Second, Defendants negotiated an agreement (the "Termination Agreement") under which Kredivo would pay expense reimbursements to the SPAC of $4 million.

52.     Third, under the Termination Agreement, Kredivo agreed that if the SPAC failed to complete an alternative transaction it would issue warrants permitting the SPAC "to acquire a stake equal to 3.5% of the fully diluted equity securities of Kredivo."

53.     The $4 million expense reimbursement and the warrants convertible to a 3.5% equity stake payable under the Termination Agreement are referred to as the "Break-up Fee."

54.     At the Transaction valuation of Kredivo, the value of the SPAC's equity share was $87.5 million. At the most recent, lower valuation of Kredivo at $1.44 billion, the value is still $50.4 million—or coincidently very close to the amount Defendants hoped to extract if they were successful in closing a transaction for the SPAC.

55.     In connection with the Termination, Defendants gave away the SPAC's valuable rights and claims under the transaction agreement to force Kredivo to close. The Termination Agreement provided Kredivo with a full release of liability from the SPAC for "all Claims with respect to, pertaining to, based on, arising out of, resulting from, or relating to the Business Combination Agreement, the Ancillary Documents or the transactions contemplated by the Business Combination Agreement."

56.     In the press release announcing the Termination, Defendants downplayed the personal financial rationale of the Termination Agreement from their own perspective and vaguely cited "unfavorable public market conditions and process delays" that rendered "it infeasible to close the transaction under the terms of the business combination agreement."

57.     Defendants remained silent as to how the contingent portion of the Break-up Fee would be distributed.

58.     While the Defendants had a year to identify an alternative transaction, they had no financial incentive whatsoever to do so and it does not appear that Defendants even tried. Any alternative transaction identified could have been awarded to another of Victory Park's multiple SPACs, and Defendants were set to reap substantial financial benefits by allowing VPCB to fail.

**C.     Defendants Announce That They Plan To Redeem All
        Class A Public Shares Without Distributing The Termination
        Fee, Which Will Be Liquidated For The Benefit Of Defendants**

59.     On March 3, 2023—only days before the SPAC's dissolution deadline of March 9, 2023—the SPAC announced that it "will not complete an initial business combination within the time period required" and would "cease all operations except for the purpose of winding up."

60.     Defendants further stated that "as promptly as reasonably possible but not more than ten business days thereafter," the SPAC would "redeem the public shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account . . . *which*

*redemption will completely extinguish public shareholders' rights as shareholders (including the right to receive further liquidation distributions, if any)*."

61.     In other words, instead of distributing the value of the Break-up Fee to holders of Class A Public Shares—for example, by having Victory Park or an affiliate purchase the asset for cash as part of the Private Investment or otherwise—Defendants have stated that they will redeem Class A Public Shares for only the amount held in the SPAC's trust account (*i.e.*, the IPO proceeds), leaving the remainder of the SPAC's assets—namely the Break-up Fee—for distribution to the Sponsor and other Defendants as holders of Class B Founder Shares.

62.     "[F]ollowing the redemption and delisting of the Company's public shares and distribution of its trust account, the [SPAC], *subject to resolution of its Class B shareholders*," the SPAC plans to "appoint Mr. Alexander Lawson and Mr. Christopher Kennedy of Alvarez & Marsal Cayman Islands Limited as voluntary liquidators of the [SPAC]."

63.     "The voluntary liquidators' role will include determining the next steps for liquidating and/or distributing the [SPAC's] remaining assets [*i.e.*, to holders of Class B Founder Shares], including, without limitation, assets to which the [SPAC] is entitled under that certain Termination and Fee Agreement."

64.     Defendants' decision to retain the value of the Break-up Fee for themselves, after having made clear at the outset of the SPAC that they would lose their entire investment if the SPAC failed to complete a successful business combination, rendered the Termination Agreement a breach of both Defendants' fiduciary duties and contractual obligations.

65.     Having stripped public stockholders from the value of the Transaction in the first place (under questionable circumstances), Defendants' owed duties, at a minimum, to fairly distribute the SPAC's assets to all owners in a dissolution, including holders of Public Shares.

Indeed, the Sponsor Agreement expressly precludes Defendants from extracting assets from the SPAC in connection with a dissolution, and thus Defendants have no legal or equitable basis whatsoever to deprive stockholders of the value of all of the SPAC's assets.

66.     Nonetheless, Defendants—each of whom have significant financial interests in the distribution of the SPAC's assets to the holders of Founder Shares—caved to their own financial interests and those of Victory Park. Absent judicial intervention, Victory Park will not only obtain the value of the Private Investment it leveraged into following the Termination, but also *free equity in Kredivo* stolen directly from the pockets of public stockholders.

## V.     CLASS ACTION ALLEGATIONS

67.     Plaintiff brings this Action pursuant to Rule 23 of the Federal Rules of Civil Procedure individually and as a class action on behalf of all holders of Class A Public Shares as of January 13, 2023 or otherwise on the date of VPCB's redemption of the Public Shares (the "Class").

68.     The Class does not include Defendants named herein, and any person, firm, trust, corporation, or other entity related by blood or marriage to or affiliated or associated with any of the Defendants or their successors in interest.

69.     The members of the Class are so numerous that joinder of all members is impracticable. Upon information and belief, VPCB's shares are beneficially owned by thousands of geographically dispersed stockholders.

70.     There are questions of law and fact common to the Class, which predominate over questions affecting any individual Class member. These common questions include, *inter alia*:

- Whether the Break-up Fee is a corporate asset of the SPAC and rightfully belongs to, and should be distributed to, holders of Class A Public Shares;

13

- Whether Defendants breached their contractual and fiduciary duties to stockholders, and will be unjustly enriched, through their scheme to misappropriate the Break-up Fee; and

- The existence and extent of injury to Plaintiff and the Class caused by such breaches, violations and misconduct.

71.     No difficulties are likely to be encountered in the management of this case as a class action.

72.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

73.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of other Class members and Plaintiff has the same interests as other Class members. Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

74.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants or adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

75.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CAUSES OF ACTION

### COUNT I

### Declaratory Judgment

76.     Plaintiff repeats and realleges the allegations set forth in the paragraphs above as if fully set forth herein.

77.     As set forth in detail above, pursuant to the Memorandum and Articles of Association, Sponsor Agreement, and Defendants' public representations, Defendants have no right, claim or other entitlement to the Break-up Fee in connection with the SPAC's dissolution.

78.     The Break-up Fee is a corporate asset of the SPAC and rightfully belongs to, and should be distributed to, holders of Class A Public Shares. Defendants have expressly waived, in connection with raising funds from the public markets, any entitlement to any asset of the SPAC in a dissolution.

79.     Plaintiff is entitled to a declaratory judgment that Defendants have no entitlement to the Break-up Fee and that the Break-up Fee must be distributed equitably to holders of Class A Public Shares.

80.     Plaintiff seeks all appropriate injunctive relief necessary to enforce the declaratory judgment entered by this Count. In the absence of such injunctive relief, stockholders will incur significant monetary and non-monetary harm.

### COUNT II

### Claim For Breach Of The Sponsor Agreement

81.     Plaintiff repeats and realleges all of the allegations set forth in the paragraphs above as if fully set forth herein.

82.     Each Defendant is a party to the Sponsor Agreement.

15

83.    Plaintiff and the Class, as public stockholders, are parties and/or third-party beneficiaries to the Sponsor Agreement.

84.    The Sponsor Agreement does not define the term "parties" to exclude public stockholders, and references throughout the term "Public Shareholders," which is expressly defined to mean "the holders of securities issued in the [IPO]." The Sponsor Agreement was executed as part of the IPO and granted the SPAC, and its public stockholders, rights and protections in connection with their acquisition of SPAC shares, which stockholders have standing to enforce directly.

85.    Even if public stockholders are not direct parties to the Sponsor Agreement, they are third-party beneficiaries because the contract was intended for the exclusive benefit of public stockholders and the benefit was substantial, immediate, and not incidental.

86.    For example, the provision waiving all "right, title, interest or claim of any kind in or to any monies held in the [SPAC's] Trust Account or any other asset of the [SPAC] as a result of any liquidation"—*i.e.*, a contractual assurance that Defendants will not misappropriate assets from the SPAC and its stockholders—exclusively benefits holders of Class A Public Shares who are entitled to receive the assets of the SPAC upon dissolution.

87.    The Sponsor Agreement enabled the completion of the IPO, and the SPAC's effort to raise funds from public stockholders could not have been done otherwise. Stockholders, as the exclusive beneficiaries, have standing to enforce those contractual rights.

88.    Defendants' decision to redeem the Class A Public Shares and liquidate and distribute the Break-up Fee to themselves was a breach of the Sponsor Agreement.

89.    The Sponsor Agreement provides that: "The Sponsor and each Insider [*i.e.*, the Defendants], with respect to itself, herself or himself, acknowledges that it, she or he has no right,

title, interest or claim of any kind in or to any monies held in the Trust Account or any other asset of the Company as a result of any liquidation of the Company with respect to the Founder Shares held by it, her or him, if any."

90.     The Break-up Fee is an amount payable "as a result of [a] liquidation" and thus Defendants disclaimed any entitlement to that asset. They have no "right, title, interest or claim" to that asset, which must be distributed to Plaintiff and the Class.

91.     This Count seeks an order requiring Defendants to equitably distribute the Break-up Fee and any remaining assets of the SPAC to Plaintiff and the Class. In the absence of such injunctive relief, Plaintiff and the Class will incur significant monetary and non-monetary harm.

## COUNT III

### Claim For Breach Of Fiduciary Duty

92.     Plaintiff repeats and realleges the allegations set forth in the paragraphs above as if fully set forth herein.

93.     Defendants owe fiduciary duties to SPAC stockholders by virtue of their control of the SPAC and their positions as officers and/or directors which require them to act in good faith and preclude them from advancing their own financial interest at the expense of public stockholders.

94.     Defendants breached their fiduciary duties by intentionally negotiating the Termination, and waiving the SPAC's rights and claims with respect to the Transaction, in exchange for the Break-up Fee which Defendants plan to appropriate for themselves as the holders of Class B Founder Shares.

95.     Defendants are each self-interested in the Termination and the distribution of the Break-up Fee because each is a holder and/or has a direct financial interest in the Class B Founder

Shares. Each participated in this concerted scheme to exchange corporate rights and assets for monetary benefits solely to themselves.

96.     Under the Sponsor Agreement, Defendants waived any entitlement to the SPAC's assets in a dissolution, and therefore Defendants have no legal, equitable or contractual entitlement, or business purpose, or any other legitimate reason, to appropriate the Break-up Fee for their own benefit. They plan to do so solely to advance their own financial interests at the expense of the public stockholders.

97.     This Count seeks an order requiring Defendants to equitably distribute the Break-up Fee and any remaining assets of the SPAC to Plaintiff and the Class. In the absence of such injunctive relief, Plaintiff and the Class will incur significant monetary and non-monetary harm.

## COUNT IV

**Derivative Claim For Breach Of Contract**
**(Alleged In The Alternative To Count II)**

98.     Plaintiff repeats and realleges the allegations set forth in the paragraphs above as if fully set forth herein.

99.     Plaintiff sets forth this Count IV in the alternative to Count II in the event that the Court determines that Counts II must be asserted derivatively.

100.     Defendants entered into the Sponsor Agreement, a valid contract, with VPCB and agreed that they have "no right, title, interest or claim of any kind in or to any monies held in the Trust Account or any other asset of the Company as a result of any liquidation."

101.     Defendants breached the Sponsor Agreement for the reasons set forth in Count II.

102.     Plaintiff is entitled to bring this action derivatively on behalf of VPCB because a majority of the Board is affiliated with and/or has a financial interest in Victory Park and the Sponsor, and thus has financial interests in the distribution of the SPAC's assets to holders of Class

B Founder Shares. Defendants Carroll and Martin are senior executives at Victory Park, which owns and controls the Sponsor and thus each have a direct and substantial financial interest in the Sponsor's Founder Shares. Further, Defendants Schmitz and Lieberman each directly own Founder Shares, and thus also have substantial financial interests in the distribution of the SPAC's assets, including the Break-up Fee, to holders of Class B Founder Shares rather than public stockholders.

103.    Defendants cannot fairly oversee the distribution of the SPAC's assets because of their conflicting financial self-interests and their demonstrated course of conduct, which has been self-interested and in breach of their fiduciary duties.

104.    This Count seeks an order requiring Defendants to equitably distribute the Break-up Fee and any remaining assets of the SPAC to Plaintiff and the Class. In the absence of such injunctive relief, Plaintiff and the Class will incur significant monetary and non-monetary harm.

<u>**COUNT V**</u>

**Derivative Claim For Breach Of Fiduciary Duty**
**(Alleged In The Alternative To Count III)**

105.    Plaintiff repeats and realleges the allegations set forth in the paragraphs above as if fully set forth herein.

106.    Plaintiff sets forth this Count V in the alternative to Count III in the event that the Court determines that Count III must be asserted derivatively.

107.    Defendants owe fiduciary duties to VPCB by virtue of their positions as officers and/or directors. Defendants breached their fiduciary duties for the reasons set forth in Count III.

108.    Plaintiff is entitled to bring this action derivatively on behalf of VPCB because a majority of the Board is affiliated with and/or has a financial interest in Victory Park and the Sponsor, and thus has financial interests in the distribution of the SPAC's assets to holders of Class

B Founder Shares. Defendants Carroll, Martin, Schmitz and Lieberman. Defendants Carroll and Martin are senior executives at Victory Park, which owns and controls the Sponsor and thus each have a direct and substantial financial interest in the Sponsor's Founder Shares. Defendants Schmitz and Lieberman each directly own Founder Shares, and thus also have substantial financial interests in the distribution of the SPAC's assets, including the Break-up Fee, to holders of Class B Founder Shares rather than public stockholders.

109.    Defendants cannot fairly oversee the distribution of the SPAC's assets because of their conflicting financial self-interests and their demonstrated course of conduct, which has been self-interested and in breach of their fiduciary duties.

110.    This Count seeks an order requiring Defendants to equitably distribute the Break-up Fee and any remaining assets of the SPAC to Plaintiff and the Class. In the absence of such injunctive relief, Plaintiff and the Class will incur significant monetary and non-monetary harm.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.    Declaring that this suit may proceed as a class action on behalf of the Class;

B.    Declaring pursuant to Count I that the Break-up Fee must be distributed equitably to Plaintiff and the Class and Defendants have no rights or entitlement to the proceeds;

C.    Declaring pursuant to Counts II and III that the Defendants breached the Sponsor Agreement and their fiduciary duties owed to Plaintiff and the Class by seeking to misappropriate the Break-Up Fee;

D.    Declaring, in the alternative to Counts II and III, that Counts IV and V are properly asserted derivatively on behalf of the SPAC and Defendants breached the Sponsor Agreement and their fiduciary duties owed to the SPAC by seeking to misappropriate the Break-Up Fee;

E.      Ordering Defendants to equitably distribute the Break-up Fee to Plaintiff and the Class of holders of Class A Public Shares;

F.      Granting any additional extraordinary, equitable and injunctive relief against all Defendants to the fullest extent permitted by law and/or equity and consistent with the allegations above;

G.      In the alternative to the equitable relief set forth above, awarding Plaintiff and the Class damages, and pre-judgment and post-judgment interest, in an amount to be proven at trial;

H.      Awarding to Plaintiff the costs of the action, including reasonable attorneys' fees, accountants' fees, consultants' fees, and experts' fees, costs, and expenses; and

I.      Granting such further relief as the Court deems just and equitable.

Dated: March 8, 2023

/s/ Aaron T. Morris
**MORRIS KANDINOV LLP**
Aaron T. Morris (5675178)
Andrew W. Robertson (4288882)
1740 Broadway, 15th Floor
New York, NY 10019
(877) 216-1552
aaron@moka.law
andrew@moka.law

*Attorneys for Plaintiff*